Michael J. Gesualdo
**ROBINSON MILLER LLC**
110 Edison Place, Suite 302
Newark, NJ 07102
Telephone: (973) 690-5400
Email: mgesualdo@rwmlegal.com

Martha Brewer Motley
(OH Bar No. 0083788)
**VORYS, SATER, SEYMOUR AND
PEASE LLP**
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-5626
Email: mbmotley@vorys.com
*pro hac vice application forthcoming*

Emma K. Morehart
(OH Bar No. 0098085)
**VORYS, SATER, SEYMOUR AND
PEASE LLP**
301 East Fourth Street, Suite 3500
Cincinnati, OH 45202
Telephone: (513) 723-4036
Email: ekmorehart@vorys.com
*pro hac vice application forthcoming*

*Attorneys for Plaintiff Bayer Healthcare LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAYER HEALTHCARE LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>KAYAMA SALES LLC, EPHRAIM STORCH, AVIGAYIL STORCH, and JOHN DOES 1-10, individually or as corporate/business entities,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. §§ 1114, 1125(A), AND RELATED STATE CLAIMS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Bayer Healthcare LLC ("Bayer" or "Plaintiff"), brings this action against Defendants Kayama Sales LLC, Ephraim Storch, Avigayil Storch, and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) common law trademark infringement and unfair competition; and (4) tortious interference with contracts. These claims arise from Defendants' misappropriation of Bayer's trademarks in connection with Defendants' unlawful advertisement and sale on the Internet of materially different and non-genuine products bearing Bayer's trademarks. In support of its complaint, Bayer alleges as follows:

## PARTIES

1.      Bayer is a limited liability company, organized under the laws of Delaware, with its principal place of business located in Whippany, New Jersey.

2.      Kayama Sales LLC ("Kayama") is a limited liability company organized under the laws of New Jersey. According to filings with the New Jersey Secretary of State, Kayama's principal place of business is 204 Wynatt St., Lakewood, NJ 08701. Kayama operates or assists in the operation of an online storefront on www.walmart.com ("Walmart") that is currently called "Kayama Sales" (the "Walmart Storefront"). The Walmart Storefront can be accessed at https://www.walmart.com/seller/101688572.

3.      Ephraim Storch ("Ephraim") is a natural person who, upon information and belief, resides at 204 Wynatt St., Lakewood, NJ 08701. Filings with the New Jersey Secretary of State identify Ephraim as the sole member of Kayama.

4.      Bayer asserts claims against Ephraim in his individual capacity and also in his capacity as the sole member of Kayama. Upon information and belief, Ephraim, in his individual

2

capacity and Kayama assist in and are responsible for the operation of and sales of products through the Walmart Storefront.

5.      Alternatively, as the sole member of Kayama, Ephraim directs, controls, ratifies, participates in, or is the moving force behind the acquisition and sale of infringing products bearing Bayer's trademarks by Kayama.  Upon information and belief, Ephraim personally participates in the acquisition and sale of infringing products by Kayama.  Accordingly, Ephraim is personally liable for infringing activities carried out by Kayama without regard to piercing the corporate veil.

6.      Alternatively, upon information and belief, Kayama follows so few corporate formalities and is so dominated by Ephraim that it is merely an alter ego of Ephraim.  Accordingly, Bayer is entitled to pierce the corporate veil of Kayama and hold Ephraim personally liable for the infringing activities of Kayama.

7.      Avigayil Storch ("Avigayil") is a natural person who, upon information and belief, resides at 204 Wynatt St., Lakewood, NJ 08701.  Storch operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "zoopersales" (the "Amazon Storefront").   The Amazon Storefront has an Amazon Merchant ID of A7QF0MG8HZ7G7      and      can      be      accessed      at https://www.amazon.com/sp?seller=A7QF0MG8HZ7G7.[1]

8.      Upon information and belief, Defendants are all acting in concert as part of a coordinated scheme to sell Bayer products.  Upon information and belief, Ephraim and Avigayil

---

[1] Every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  Even if Defendants change the name of their Amazon storefront at some time in the future, their storefront can always be accessed at the link provided which includes the Merchant ID number for the storefront.

are married, reside at the same address, and operate the online storefront to sell materially different and non-genuine products bearing Bayer's trademarks.

9.    Bayer believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Bayer.  Therefore, Bayer sues these defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Bayer will seek leave to amend this Complaint accordingly.  If Bayer does not identify any such parties, it will dismiss these defendants from this action.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  Bayer's federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a), and its claims arising under the laws of the State of New Jersey are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

11.    This Court has personal jurisdiction over Defendants because they are all citizens of New Jersey.  Ephraim and Avigayil are domiciled in New Jersey.  Kayama is a limited liability company whose sole member is a New Jersey resident.  Kayama is therefore a citizen of New Jersey.

12.    Venue is properly found in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS
**Bayer and Its Trademarks**

13.     Bayer develops, designs, manufactures, markets, distributes, and sells mainly nonprescription over-the-counter healthcare and medicinal products under numerous marks owned or licensed by Bayer.  These products include many products that consumers ingest or apply to their bodies.

14.     Bayer allows its products to be sold to end-user consumers in the United States only by sellers who Bayer has expressly authorized to sell Bayer products ("Authorized Sellers").  These sellers include authorized distributors and retailers.

15.     Bayer allows Authorized Sellers to sell Bayer products only in approved channels and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Bayer Rules").

16.     Bayer devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By distributing Bayer products to end-user consumers exclusively through Authorized Sellers that are required to follow the quality controls and other requirements in the Bayer Rules, Bayer ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of its brands.  In the highly competitive market for healthcare and medicinal products, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

17.     To promote and protect its brands and reputation, Bayer owns numerous trademarks that have been registered with the United States Patent and Trademark Office.  These trademarks include, but are not are not limited to: AFRIN® (U.S. Trademark Reg. Nos. 2,547,372, 1,709,138, and 1,052,754), ALEVE® (U.S. Trademark Reg. Nos. 3,287,780 and 1,536,042), ALKA-SELTZER®

(U.S. Trademark Reg. Nos. 5,627,883, 1,914,472, 0,667,053, and 0,510,330), ALKA-SELTZER PLUS® (U.S. Trademark Reg. No. 0,864,883), A+D® (U.S. Trademark Reg. No. 2,547,314), CLARITIN® (U.S. Trademark Reg. Nos. 3,621,772, 3,140,850, 2,816,780, 2,824,753, and 1,498,292), CLARITIN-D® (U.S. Trademark Reg. Nos. 2,819,388 and 1,912,214), CHILDREN'S CLARITIN® (U.S. Trademark Reg. No. 3,332,199), CORICIDIN® (U.S. Trademark Reg. Nos. 1,002,530 and 0,533,777), LOTRIMIN® (U.S. Trademark Reg. No. 1,001,433), MIRALAX® (U.S. Trademark Reg. Nos. 4,426,594 and 3,120,379), MIDOL® (U.S. Trademark Reg. Nos. 3,444,486, 2,278,871 and 0,080,651), ONE A DAY® (U.S. Trademark Reg. No. 5,198,339), PHILLIPS'® (U.S. Trademark Reg. No. 3,811,454), SOLARCAINE® (U.S. Trademark Reg. No. 1,413,916), and TINACTIN® (U.S. Trademark Reg. Nos. 2,060,013 and 0,780,553) (collectively, the "Bayer-owned Trademarks").  The registration for each of the Bayer-owned Trademarks is valid, subsisting, and in full force and effect.

18.     Further, Bayer's right to use many of the Bayer-owned Trademarks has become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, Bayer received no final legal decision issued against the trademarks, and Bayer timely filed a Section 15 Declaration describing the trademarks' use.  Accordingly, these trademarks serve as conclusive evidence of Bayer's ownership of the marks and of its exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

19.     Bayer actively uses, advertises, and markets products bearing all of the Bayer-owned Trademarks in commerce throughout the United States.

20.     Bayer is also the exclusive U.S. licensee of numerous trademarks that have been registered with the United States Patent and Trademark Office.  These trademarks include:

ASTEPRO® (U.S. Trademark Reg. No. 3,659,066) and CITRACAL® (U.S. Trademark Reg. No. 1,360,063) (collectively, the "Bayer-licensed Trademarks") (combined with the Bayer-owned Trademarks, the "Bayer Trademarks").

21.     Products bearing the Bayer Trademarks ("Bayer Products") stand for trust, reliability, and quality throughout the world and consistently rank as leading products in the global pharmaceutical industry.

22.     Bayer Products are highly recommended by pharmacists and professionals, and are recognized and known by consumers as being safe, effective, reliable, and of high quality.

23.     Since its inception, Bayer has been committed to taking all possible measures to guarantee high quality, innovative, and effective products.  Because of the quality, reliability, and safety of Bayer Products, consumers recognize and associate the Bayer Trademarks with high-quality and dependable medicinal products in the consumer-healthcare industry.

24.     For all of these reasons, the Bayer Trademarks are widely recognized by the general consuming public of the United States and Bayer is recognized as the source of products bearing the Bayer Trademarks.

25.     Due to the superior quality and exclusive distribution of Bayer Products, and because Bayer is recognized as the source of high-quality products, the Bayer Trademarks have enormous value.

### Online Marketplaces and the Challenge They Present to Bayer Product Quality and Goodwill

26.     E-commerce retail sales have exploded over the past decade.  From 2014 through the beginning of 2024, the percentage of total retail sales in the United States that was completed through e-commerce channels rose from 6.2% to 15.9%.  E-Commerce Retail Sales as a Percent

of Total Sales, FEDERAL RESERVE BANK OF ST. LOUIS (July 10, 2024), https://fred.stlouisfed.org/series/ECOMPCTSA.

27.     In 2023, consumers spent approximately $1.12 trillion on e-commerce sales, a 7.6% increase from 2022.  *See* Abbas Haleem, *US ecommerce sales reached $1.119 trillion in 2023,* DIGITAL           COMMERCE       360       (February       26,       2024), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

28.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

29.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

30.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who can obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

31.     It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-

savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.    It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.   *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

32.    Third-party sellers on Amazon may also sell counterfeit items or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

33.    For example, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."    Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.   The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."   *Id*. at 14-15, 38.   *See also* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

34.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea market of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/.

35.     In its annual reports to its shareholders beginning in 2018 and continuing each year to the present, Amazon has acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2024), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/c7c14359-36fa-40c3-b3ca-5bf7f3fa0b96.pdf.  Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

36.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand's inability to exercise control over the quality of its products presents serious risks to the safety of consumers.

37.     The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

38.     When purchasing products on an online marketplace, customers do not know if a seller of a product is authorized by the brand.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand or, at minimum, from an authorized seller that is selling under the brand's oversight and with the brand's approval.

39.     For all these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand's quality controls.

40.     When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor-quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

41.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

42.     Online product reviews significantly impact a brand's reputation.  Survey results show that 99.75% of United States consumers read reviews "at least sometimes" when they consider buying a new product online, and 45% will not purchase a product if there are no reviews available for it.  *Survey: The Ever-Growing Power of Reviews (2023 Edition)*, Power Reviews, https://www.powerreviews.com/research/power-of-reviews-2023/ (last visited July 10, 2024).

43.     Reviews are especially impactful on online consumers.  In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears

to be compromised.  However, online consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality.  Therefore, online consumers rely more on brand reputation and reviews.

44.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  Not only are consumers less likely to buy a product with negative reviews, websites like Amazon use algorithms to downgrade products they believe consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to further downgraded product placement.

### Bayer's Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written by Consumers Who Purchased Poor-Quality Products From Unauthorized Sellers on Online Marketplaces

45.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

46.     Numerous consumers have written negative reviews of Bayer Products being offered for sale on online marketplaces.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Bayer Products low "ratings" and complained of receiving products that were damaged, previously used, tampered with, expired, different in appearance and quality from Bayer Products consumers had previously purchased, and foul-smelling.

47.     For example, Defendants have sold on Amazon the product seen in the screenshot below:



48.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were damaged and were melted, moldy, or noxious as a result of improper storage:





 Sem

★☆☆☆☆ **Product came melted and smell disgusting**
Reviewed in the United States on April 26, 2024
Flavor Name: No Artificial Flavor | Size: 60 Count (Pack of 1) | Verified Purchase

This product smells absolutely horrendous! It's melted into a disgusting mess due to the heat, leaving foul yellow stains all around. It's complete trash and extremely dangerous for health! Refund my money!



 RJ

★☆☆☆☆ **Vitamins seem off**
Reviewed in the United States on April 22, 2024
Flavor Name: Unflavored | Size: 30 Count (Pack of 1) | Verified Purchase

The coating is melted off the vitamins and they smell rancid. I have purchased these vitamins in person at Target many times before and they were fine. Would not recommend ordering them here

 Kami L Logan

★☆☆☆☆ **Very Fishy**
Reviewed in the United States on April 22, 2024
Flavor Name: Unflavored | Size: 30 Count (Pack of 1) | Verified Purchase

This is the first and last time I will buy this product online. When I took the sealed lid off the smell of fish was intense and when I looked inside there was yellow liquid all over. I have bought this product in store and have never had this. I don't want to touch these pills let alone put them in my mouth.



 cinthia

★☆☆☆☆ **Disgusting**
Reviewed in the United States on April 13, 2024
Flavor Name: Unflavored | Size: 30 Count (Pack of 1) | Verified Purchase

Capsules taste disgusting and came out melted and broken....they don't accept returns even tho the whole thing is garbage. DO NOT BUY!



 Wildflower Blue

★☆☆☆☆ **I'm DISGUSTED and ANGRY!!!**
Reviewed in the United States on March 12, 2024
Flavor Name: Unflavored | Size: 30 Count (Pack of 1) | Verified Purchase

I have been taking this for over a month and noticed it had a weird smell but never really looked closer. Today I took the cap off and realized the top was moldy!!!! When looking into the bottle I saw that it was yellow and discolored and also had MOLD on the bottom. This is disgraceful that a company that is supposed to be providing pregnant woman a safe way to get all your nutrients is poisoning us and our babies with inferior dangerous products. Im outraged and angry 🔴



 shiva

⭐☆☆☆☆ **Ordered 2 bottles; came with strong bad smell & damaged pills**
Reviewed in the United States on March 8, 2024
Flavor Name: Unflavored  |  Size: 30 Count (Pack of 1)  |  Verified Purchase

Ordered 2 bottles; came with strong bad smell and one of the bottles with deformed bottle and damaged pills. really disappointed that packaging was done badly with damaged contents which is aimed for pregnant ladies which can hurt 2 lives!



 Victoria

⭐☆☆☆☆ **Defective**
Reviewed in the United States on February 3, 2024
Flavor Name: Unflavored  |  Size: 30 Count (Pack of 1)  |  Verified Purchase

I opened the bottle to a pool of greenish yellow slime. I'm not sure if the pills melted or what put I was so disgusted that I threw the bottle out immediately. Horrible! And they don't offer a refund!

 Heather M Jensen

⭐☆☆☆☆ **Wildly inconsistent**
Reviewed in the United States on January 17, 2024
Flavor Name: Unflavored  |  Size: 30 Count (Pack of 1)  |  Verified Purchase

I've had bottles that were exploded pills. I've had batches that were disgustingly fishy. And bottles that were none of the above. The QC is wildly bad. Save your money and go elsewhere

 Fatima Morales

⭐☆☆☆☆ **Damaged product**
Reviewed in the United States on January 9, 2024
Flavor Name: Unflavored  |  Size: 30 Count (Pack of 1)  |  Verified Purchase

All pills were damaged, seems like they all exploded. Worst part it can not be refunded.



 Kaitlyn Lavaroni

⭐☆☆☆☆ **Prenatal Vitamins I received were unsealed and moldu**
Reviewed in the United States on January 3, 2024
Flavor Name: No Artificial Flavor  |  Size: 60 Count (Pack of 1)  |  Verified Purchase

I purchased prenatal vitamins. The vitamin bottle was not sealed. The pills inside were wet, moldy, and foul smelling.

49.     Below is a screenshot of another Bayer product that Defendants have sold on Amazon:



50.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were damaged or near expiration:







51.     The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Bayer Products listed on Amazon that Defendants have sold through their Amazon Storefront.  These reviews hurt Bayer's sales and goodwill because consumers around the world view and rely on these reviews, even when purchasing Bayer Products offline. Even when the text of a review makes clear that the problem was seller-caused, it will lower the Bayer product's average review score and search placement.

52.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold a high volume of products bearing the Bayer Trademarks on Amazon and are not subject to Bayer's quality controls, however, it is exceedingly likely that some of the foregoing negative reviews—and the other similar negative reviews of Bayer Products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Bayer Trademarks from Defendants.

**Bayer Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Caused By Online Marketplaces and Ensure Customers Receive the Genuine, High-Quality Products They Expect From Bayer**

53.     The above reviews show how sales of poor-quality Bayer Products disappoint Bayer's consumers and cause significant harm to the reputation and goodwill of Bayer and its brands.  To protect itself and consumers from these harms, Bayer implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

54.     The goals of Bayer's quality control program are to minimize the likelihood that poor-quality products reach consumers and ensure that consumers who purchase Bayer Products, including consumers who buy online, receive the high-quality products and services they expect from Bayer Products.  By preventing consumers from receiving poor-quality products, the program

17

both protects consumers from confusion and also protects the value and goodwill associated with the Bayer Trademarks.

55.     Bayer's ability to exercise quality controls is particularly important for the products it sells because many Bayer Products are ingested by consumers or applied to consumers' bodies and there may be health and safety risks associated with products that are expired or have not been properly inspected, stored, or handled.

56.     Bayer abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

57.     Bayer's ability to exercise its quality controls is essential to the integrity and quality of Bayer Products, as well as the value of the Bayer Trademarks and other intellectual property.

**Authorized Sellers May Sell Bayer Products Only Through Specific Channels and Must Adhere to Bayer's Quality Control and Customer Service Requirements**

58.     Bayer maintains strict quality controls over Bayer Products by allowing them to be purchased by end-user consumers only from Authorized Sellers.  Bayer's Authorized Sellers include Authorized Distributors, Authorized Resellers, and Authorized Retailers.

59.     All of Bayer's Authorized Sellers are permitted to sell Bayer Products only in certain channels and are required to abide by the Bayer Rules.  Thus, every Authorized Seller that sells Bayer Products is subject to Bayer's quality control requirements.

60.     The Bayer Rules require Authorized Sellers to purchase the Bayer Products they resell only from Bayer or other Authorized Sellers.  This restriction ensures that Authorized Sellers exclusively sell products that are subject to Bayer's quality controls and do not sell products that are diverted, unsafe, or potentially counterfeit.

61.     The Bayer Rules also limit to whom and where Authorized Sellers may sell Bayer Products.  To prevent persons outside of Bayer's quality controls from acquiring and reselling Bayer

18

Products, the Bayer Rules prohibit Authorized Sellers from selling Bayer Products to any third party who is not an Authorized Seller and who intends to resell the products. Authorized Sellers are permitted to sell Bayer Products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

62.     Given the many perils of unauthorized online sales as described above, Authorized Sellers are also prohibited from selling Bayer Products on any website they do not themselves own and operate unless they first apply for and receive written approval from Bayer.

63.     These restrictions are essential to Bayer's ability to exercise its quality controls over Bayer Products because they: (1) prevent unauthorized sellers from obtaining and reselling Bayer Products and (2) allow Bayer to know where all of its products are being sold online by Authorized Sellers. If a quality issue arises through an online sale, Bayer can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately. Bayer is unable to take such actions with unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality or customer service issues that may arise.

64.     In addition to restricting where and how Authorized Sellers can acquire and sell Bayer Products, the Bayer Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, storage, handling, and sale of Bayer Products.

65.     To ensure that customers receive the genuine and high-quality products they expect from Bayer, the Bayer Rules require Authorized Sellers to inspect all Bayer Products for any damage, defects, evidence of tampering or previous use, and other non-conformance and remove all such products ("Non-Conforming Products") from their inventory. Authorized Sellers are prohibited from selling Non-Conforming Products, must destroy or dispose of all Non-Conforming

Products in accordance with instructions provided by Bayer, and are required to report their discovery of any Non-Conforming Products to Bayer to assist Bayer with identifying any product quality issues.

66.      Authorized Sellers must also regularly inspect their inventory for any products that are expired or within 60 days of expiration ("Not-Current Products"), not sell any Not-Current Products to consumers, and destroy or dispose of all Non-Current Products in accordance with instructions provided by Bayer.

67.      The Bayer Rules also require that Authorized Sellers store Bayer Products within a narrow temperature range, in a secure location with controlled access, and in accordance with other guidelines issued by Bayer.  These requirements help ensure that Bayer Products are properly stored and are not damaged or otherwise compromised prior to being shipped to the consumer. Authorized Sellers must also alert Bayer in writing and follow further instructions if they: (i) believe any Bayer Products in their possession were subject to prolonged excessive heat or temperature or (ii) become aware of or suspect that any third party is in possession of counterfeit Bayer Products.

68.      To further ensure that Bayer Products are properly stored and in pristine condition, Authorized Sellers must examine all delivery vehicles and their contents before accepting Bayer Products that arrive in delivery vehicles.  In their examinations, Authorized Sellers must inspect for internal cleanliness and hatch seal integrity, measure the internal temperature for temperature-controlled materials, and inspect for evidence of potential quality and security concerns such as torn or punctured cases and exposure to moisture.

69.      To avoid consumer confusion and ensure that customers receive genuine Bayer Products, Authorized Sellers must sell Bayer Products in their original packaging and are

prohibited from altering, modifying, relabeling, repackaging, unbundling, or bundling Bayer Products or any accompanying label, literature, or safety-related information without Bayer's consent. Authorized Sellers are also prohibited from reselling any Bayer Product that has been returned, opened, or repackaged.

70.     Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Bayer Products, including any serial number, UPC code, or other identifying information.

71.     The Bayer Rules give Bayer the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Bayer Products, to ensure their compliance with Bayer's quality control requirements. During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of all their sources of Bayer Products.

72.     Authorized Sellers also must cooperate with Bayer with respect to any product recall or other consumer safety information dissemination effort conducted by Bayer regarding Bayer Products.

73.     The Bayer Rules also require Authorized Sellers to provide various customer services to their customers. For example, Authorized Sellers must familiarize themselves with the features of all Bayer Products kept in their inventory so they can advise customers on the selection and safe use of Bayer Products, offer ongoing support to consumers, and promptly respond to consumer inquiries before and after their sale of Bayer Products. Authorized Sellers must also immediately report to Bayer any customer complaint they receive regarding a Bayer Product and assist Bayer in investigating any such complaint.

74.     Bayer's quality control and customer service requirements are legitimate and substantial and have been implemented so that Bayer can control the quality of goods manufactured and sold under the Bayer Trademarks, to protect consumers as well as the value and goodwill associated with the Bayer Trademarks.

75.     Bayer's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor-quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Bayer Product they were considering buying was being sold by an Authorized Seller who is subject to Bayer's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Bayer's quality controls and over whom Bayer is unable to exercise its quality controls.

### Because of the Flood of Poor-Quality Products Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Bayer Imposes Additional Requirements on Its Authorized Sellers Who Sell Online

76.     As shown in the consumer reviews cited above (*see* ¶¶ 47-50, *supra*), Bayer Products sold online are more susceptible to quality and authenticity problems because consumers cannot see products before buying them.  These problems are especially severe on online marketplaces, where sellers can conceal the fact that they are an unauthorized seller, and many sellers may share a single product listing page.  Given the heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Bayer imposes additional quality control requirements on all of its Authorized Sellers that sell Bayer Products online.

77.     The Bayer Rules allow Authorized Sellers to sell Bayer Products to end-user consumers only through "Permissible Public Websites" and "Approved Websites."  These rules allow Bayer to oversee all Authorized Sellers that sell Bayer Products online.

78.     A "Permissible Public Website" is a website that: (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name; (2) lists the Authorized Seller's name, mailing address, telephone number, and email address; and (3) except for a small subset of websites operated by large retailers over which Bayer already has visibility, has been registered with Bayer.  Permissible Public Websites do not include storefronts on any online marketplace.

79.     Authorized Sellers must receive prior written approval from Bayer before they can sell Bayer Products on any website that does not meet the criteria of a Permissible Public Website. To obtain this approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Bayer Products, and list the specific websites where they wish to sell products.  Applicants then undergo vetting by Bayer that includes review of their business operating record and online review history.  A website that Bayer permits an Authorized Seller to use through this process is called an "Approved Website."

80.     The Bayer Rules impose numerous additional requirements on Authorized Sellers who sell Bayer Products on Permissible Public Websites or Approved Websites (collectively, "Authorized Online Sellers").

81.     For example, Authorized Online Sellers must exclusively use images of Bayer Products that are provided or approved by Bayer and keep product descriptions up to date. Authorized Online Sellers are also prohibited from advertising any Bayer Product they do not carry in their inventory.

82.     The Bayer Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Bayer or another

third party.  These requirements allow consumers of Bayer Products to understand the nature of the seller from whom they are purchasing and enable consumers to contact the seller if any quality issues arise.  These requirements also allow Bayer to protect the public from the sale of poor-quality or counterfeit Bayer Products because it allows for easy detection of any Authorized Online Seller that sells poor-quality or counterfeit goods.

83.    Authorized Online Sellers who sell Bayer Products on Approved Websites may sell products only on the website(s) and under the name(s) specifically approved by Bayer.  At Bayer's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Public Website or Approved Website where Authorized Online Sellers are selling Bayer Products.

84.    Unless otherwise approved by Bayer, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Bayer Products.  Authorized Online Sellers are also prohibited from using any fulfillment service that could cause customers to receive Bayer Products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet Bayer's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Bayer's quality controls.

85.    All websites where Authorized Online Sellers sell Bayer Products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to Bayer upon request; and (iii) cooperate with Bayer in investigating negative online reviews related to sales of Bayer Products.

86.     The additional quality control requirements that Bayer imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow Bayer to carefully control the quality of Bayer Products that are sold online and quickly address any quality issues that arise.

87.     Bayer's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Bayer Products online receive genuine, high-quality Bayer Products that abide by Bayer's quality controls.  Consumers purchasing Bayer Products online would find it relevant to their purchasing decision to know whether a product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, Bayer's quality controls.

### Bayer Audits and Monitors Its Authorized Online Sellers to Ensure They Comply with Its Quality Control Requirements

88.     Bayer regularly audits its Authorized Online Sellers to ensure they are adhering to its quality control requirements.  Bayer conducts its auditing and monitoring actions pursuant to an internal program called the Bayer Online Quality Control Program ("Auditing Program").

89.     As part of its Auditing Program, Bayer examines every Approved Website and a rotating sample of Permissible Public Websites each month to ensure that the Authorized Online Sellers who sell through the websites are complying with the Bayer Rules.  During these examinations, Bayer checks to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Bayer or a third party; (iii) do not display any content that could be detrimental to Bayer or its brands; (iv) do not make any representations regarding Bayer Products that are misleading; (v) exclusively contain images of Bayer Products and product descriptions that are

supplied or authorized by Bayer and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

90.     Bayer also periodically inspects online reviews of Bayer Products and Authorized Online Sellers that appear on Approved Websites and Permissible Public Websites.  If Bayer discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor-quality Bayer Products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Bayer communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

91.     Each month, Bayer also purchases Bayer Products from a rotating sample of Approved Websites and Permissible Public Websites.  If Bayer discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling online—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Bayer communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

92.     If Bayer discovers that an Authorized Online Seller is selling Bayer Products of poor quality or otherwise not adhering to Bayer's quality control or customer service requirements, Bayer may conduct an investigation to determine the source of the problem.  The Bayer Rules require that Authorized Online Sellers cooperate with Bayer's investigation, permit Bayer to inspect their facilities and records relating to Bayer Products, and disclose all information about where they obtained Bayer Products.  Based on what its investigation reveals, Bayer has the right

to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Bayer Products.

### Genuine Bayer Products Come with Bayer's Satisfaction Guarantee; Products Sold by Defendants Do Not

93. Bayer Products that are purchased from an Authorized Seller also come with Bayer's 60-day satisfaction guarantee (the "Satisfaction Guarantee").

94. Under the Bayer Satisfaction Guarantee, a customer is able to receive a full refund of the purchase price of a Bayer Product within 60 days of the original purchase date if the customer is dissatisfied with the product for any reason. The complete terms of the Bayer Satisfaction Guarantee can be viewed at https://www.livewell.bayer.com/satisfactionguarantee and are incorporated herein.

95. Bayer extends the Bayer Satisfaction Guarantee only to products that were sold by sellers who are subject to Bayer's quality controls. Because products sold by unauthorized sellers are not subject to Bayer's quality controls and Bayer cannot ensure the quality of such products, the Bayer Satisfaction Guarantee does not cover Bayer Products sold by unauthorized sellers, including Defendants. The Bayer Satisfaction Guarantee specifically states that "because we are unable to control the quality of our products sold by unauthorized sellers . . . the Bayer 60-Day Satisfaction Guarantee ('Guarantee') is not available for products purchased from unauthorized resellers."

### Defendants Are Not Authorized Sellers and Are Illegally Selling Non-Genuine Products Bearing the Bayer Trademarks

96. Because the unauthorized sale of Bayer Products on the Internet threatens the reputation and goodwill associated with the Bayer Trademarks, Bayer actively monitors the sale of its products online.

97. In the course of this monitoring, Bayer discovered that high volumes of products bearing the Bayer Trademarks were being illegally sold through unauthorized storefronts. Through investigation, Bayer identified Defendants as the operators of the unauthorized storefronts and as the

parties who are responsible for the unlawful sale of products bearing the Bayer Trademarks through the unauthorized storefronts.

98.    Defendants are not Authorized Sellers of Bayer Products and are not subject to, and do not comply with, the Bayer Rules or the quality controls that Bayer imposes on its Authorized Sellers.

99.    On July 13, 2023, counsel for Bayer sent a cease-and-desist letter to Defendants. The letter explained that Defendants are infringing the Bayer Trademarks and engaging in unfair competition by selling products that are materially different from genuine products sold by Bayer's Authorized Sellers and that are not subject to, do not abide by, and interfere with Bayer's quality controls. The letter also explained that Defendants are tortiously interfering with Bayer's contracts by purchasing products from Authorized Sellers, who are prohibited from selling products to persons or entities who are not Authorized Sellers and who resell the products. Bayer's letter demanded that Defendants permanently cease selling products bearing the Bayer Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

100.    Defendants did not respond to Bayer's July 13, 2023 letter or cease selling products bearing the Bayer Trademarks. On July 27, 2023, Bayer sent a second cease-and-desist letter to Defendants that repeated the demands in its first letter. Defendants likewise did not respond to that letter or cease selling products bearing the Bayer Trademarks. On August 11, 2023, Bayer sent a draft complaint outlining its claims against Defendants. Finally, as a last effort to avoid litigation, Bayer sent a second draft complaint to Defendants in July 2024. To date, Defendants have not responded to any of Bayer's correspondences and have continued to sell a high volume of products bearing the Bayer Trademarks.

101.   Defendants' disregard of Bayer's correspondence and continued sales of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants Are Infringing the Bayer-owned Trademarks and Engaging in Unfair Competition as to the Bayer-licensed Trademarks by Selling Products That Are Not Subject to, Do Not Abide by, and Interfere with Bayer's Quality Control and Customer Service Requirements**

102.   Defendants, without authorization from Bayer, have sold—and continue to sell—products bearing the Bayer Trademarks through the unauthorized storefronts.  Defendants may also be selling products through additional channels that Bayer has not yet discovered and cannot discover until it is able to take discovery.

103.   Bayer has implemented quality control and customer service requirements throughout its authorized channels of distribution.  Defendants are not Authorized Sellers of Bayer Products, and the products sold by Defendants are not genuine Bayer Products because they are not subject to, do not abide by, and interfere with Bayer's quality control and customer service requirements that Authorized Sellers must follow.

104.   Bayer's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to, do not abide by, and interfere with these requirements, Bayer has lost control of the quality of its products.

105.   Defendants do not abide by Bayer's quality control requirements because they have not provided Bayer with their business information nor given Bayer an opportunity to vet them to determine if they meet Bayer's high standards for what it demands of its Authorized Sellers that it approves to sell Bayer Products online through Approved Websites.  Instead, Defendants sell products on online marketplaces in violation of the Bayer Rules and without Bayer's authorization or oversight.

106.     Defendants do not comply with Bayer's quality control requirements—and interfere with Bayer's quality controls—because they have not disclosed to Bayer where they sell Bayer Products online.  Defendants also do not provide customer feedback to Bayer that relates to their sales of products bearing the Bayer Trademarks or cooperate with Bayer in investigating negative online reviews relating to their sales of products bearing the Bayer Trademarks, as Authorized Online Sellers are required to do.  These actions prevent Bayer from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Bayer Trademarks.

107.     Defendants also do not comply with Bayer's quality control requirements—and interfere with Bayer's quality controls—because they: (1) have not disclosed to Bayer where they acquire Bayer Products; and (2) have not given Bayer the right to audit and inspect their facilities and records.  As a result, among other things, Bayer cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products and delivery vehicles, and not selling poor-quality or expired products; (iii) selling products only in official and unaltered Bayer packaging; (iv) not selling any products that were returned, opened, or repackaged; (v) improperly allowing products that have been returned or repackaged to be listed as "new" products; (vi) preventing their products from being commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vii) providing exceptional customer service and responding appropriately to feedback received from customers.  Bayer also cannot obtain Defendants' assistance with any recall or consumer safety information efforts that may arise related to any products they are selling or have sold in the past.

108.    Numerous customers have written reviews of Defendants' Amazon Storefront in which they complained of receiving products that were damaged, previously used, expired, or suspected counterfeits.  Customers have also complained that they received products that were different from what they ordered or different from what Defendants had advertised.  Although Amazon has added comments to some of these reviews stating that Amazon takes "responsibility" for the "fulfillment experiences" described in the reviews, the issues and complaints that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants: [2]

★☆☆☆☆  "it came with paper bag, so the color box damaged, also the package looks not the same as local markets, worry if its real or not. would return it. "

By Maggie K. on June 23, 2024.

★☆☆☆☆  "Package arrived with rotten product. Stinking like rotten potatoes. Not happy, Will never order again! "

By Karlene Rader on June 10, 2024.

★☆☆☆☆  "This order says that there are 2 bottles but I only received 1 bottle (for the price of 2!) "

By J. Lee on April 25, 2024.

★☆☆☆☆  "I only received half of my order. I ordered a twin pack, but the other half was missing from this delivery. "

By Ryan on April 19, 2024.

★☆☆☆☆  "Hello, I just received the eye drop with an expiration date of 2024/02. You should not be selling expired items and I am demanding a refund. "

By Brenda A. Pate on April 15, 2024.

★☆☆☆☆  "Item was opened and had been used. "

By Angela on April 13, 2024.

---

[2] When Amazon sellers utilize the "Fulfillment by Amazon" service, Amazon itself is responsible for shipping the items.  At a third-party seller's request, Amazon is able to "strike" a negative review as attributable to Amazon, not the seller—even in situations where, as here, the issues are plainly related to the quality of the seller's product.  *See* https://sell.amazon.com/fulfillment-by-amazon.

⭐☆☆☆☆ "I normally get this product from my local drug store but I saw it was it was cheaper on Amazon the product was orange in color and smelled like glue I knew something was wrong cuz I use this product all the time I just went up to my normal store and repurchased the same item and it's not orange and doesn't smell like glue it's identical to all the other bottles I've purchased in the past "
Read less

By Jenn on April 4, 2024.

⭐☆☆☆☆ "Received the product and it was expired, the box smelled like expired food, as soon as i opened the bottle there was green and yellow stuff all on them. Plus the package arrived a week later then expected. Very disappointed "
Read less

By Leilasells on March 20, 2024.

⭐☆☆☆☆ "Do not buy this product here. I received a fake product that had no expiration date. No way would I put a preservative free eye drop of unknown expiration date in my eyes. No way. Box went straight in the trash. "
Read less

By zztop on March 12, 2024.

109.    These reviews are only a sample of the negative reviews that customers have written about Defendants and their unauthorized storefronts.  Bayer allows its products to be sold only by Authorized Sellers who are subject to its quality controls to prevent customers from suffering experiences like those described in the above complaints about Defendants.

110.    These reviews, along with the numerous negative reviews of Bayer Products Defendants have sold in which customers complained of similar issues, *see supra* ¶¶ 47-50, show that Defendants are very likely not carrying out the quality control inspection, storage, handling, or customer service requirements that Bayer requires Authorized Sellers to follow for Bayer Products.  Instead, Defendants are providing poor customer service and likely selling products bearing the Bayer Trademarks that are damaged, tampered with, not sealed, previously used, old, and expired.  These sales cause customers to write highly negative reviews of Bayer Products that harm Bayer's reputation and hurt the placement of Bayer Products in search results.

111.    Defendants' failure to abide by the Bayer Rules prevents Bayer from exercising control over the quality of products Defendants sell bearing the Bayer Trademarks.  Unlike with its Authorized Online Sellers, Bayer cannot monitor or audit Defendants to ensure they are

complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

112.    Through their unauthorized use of the Bayer Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Bayer Products.  In reality, however, the products sold by Defendants are materially different from genuine Bayer Products—and are not genuine products—because they are not subject to, do not abide by, and interfere with Bayer's quality control and customer service requirements that Authorized Sellers must follow.

**Defendants Are Infringing the Bayer-owned Trademarks and Engaging in Unfair Competition as to the Bayer-licensed Trademarks by Selling Products That Do Not Come with the Bayer Satisfaction Guarantee**

113.    As set forth above, genuine Bayer Products purchased from an Authorized Seller come with the Bayer Satisfaction Guarantee.  However, Bayer does not provide the Bayer Satisfaction Guarantee for products purchased from sellers that are not Authorized Sellers because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

114.    Because Defendants are not Authorized Sellers and are thus not subject to Bayer's quality control requirements, the products bearing the Bayer Trademarks that Defendants sell do not come with the Bayer Satisfaction Guarantee.

115.    Because the products Defendants sell do not come with the Bayer Satisfaction Guarantee, they are materially different from genuine Bayer Products.

116.    The Bayer Satisfaction Guarantee is a material component of genuine Bayer Products.  Consumers considering whether to purchase Bayer Products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Bayer Satisfaction Guarantee.  Consumers who purchase Bayer Products with the Satisfaction Guarantee

receive the peace of mind that they are receiving a high-quality product, that Bayer stands behind the product, and that they can get a refund if they are not completely satisfied.

117.    Defendants' unauthorized sale of non-genuine products bearing the Bayer Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Bayer Products that come with the Bayer Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering with
Bayer's Agreements with its Authorized Sellers**

118.    As discussed, Bayer allows Bayer Products to be sold only by Authorized Sellers.

119.    Bayer has entered into agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Bayer Products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

120.    Defendants have sold and are continuing to sell a high volume of products bearing the Bayer Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers. Thus, upon information and belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

121.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Bayer.

122.    Defendants have known that Bayer's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

123.    Defendants have known of this prohibition since approximately July 13, 2023.  On or around that date, Defendants received a cease-and-desist letter informing them that Bayer has agreements with all of its Authorized Sellers that prohibit them from selling Bayer Products to any person or entity that, like Defendants, is not an Authorized Seller but intends to resell the products. Bayer's letter also informed Defendants that: (i) by purchasing Bayer Products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement between Bayer and its Authorized Seller and were interfering with Bayer's agreements and business relationships; and (ii) if Defendants continued to acquire products from Bayer's Authorized Sellers for the purpose of reselling them, they would be liable for tortiously interfering with Bayer's contracts and business relationships with its Authorized Sellers.

124.    Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Bayer's agreements with its Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

125.    In interfering with Bayer's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Bayer Products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Bayer—so that Defendants could unlawfully infringe upon and materially damage the value of the Bayer Trademarks by reselling the products on the Internet, thereby committing an independent tort.

126.    Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**Bayer Has Suffered Significant Harm as a Result of Defendants' Conduct**

127.    As set forth above, the unauthorized sale of products bearing the Bayer Trademarks by unauthorized sellers such as Defendants has caused significant harm to Bayer and its brands.

128.    When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Bayer.  As such, Defendants' ongoing sale of non-genuine products bearing the Bayer Trademarks harms Bayer and its brands.

129.    Bayer has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

130.    Bayer has also suffered, and will continue to suffer, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

131.    Bayer is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Bayer Trademarks, causing continued irreparable harm to Bayer's reputation, goodwill, relationships, intellectual property, and brand integrity.

132.    Additionally, Bayer is entitled to injunctive relief requiring Defendants to return or destroy infringing products because without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

133.    Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

134.    Defendants' willful infringement of the Bayer Trademarks and continued pattern of misconduct demonstrate intent to harm Bayer.

**FIRST CAUSE OF ACTION**
**Trademark Infringement – 15 U.S.C. §§ 1114, 1125(a)(1)[3]**

135.    Bayer hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.    The Bayer-owned Trademarks have been registered with the United States Patent and Trademark Office.

137.    Bayer is the owner of the Bayer-owned Trademarks.

138.    The Bayer-owned Trademarks are valid and subsisting trademarks in full force and effect.

139.    Defendants willfully and knowingly used, and continue to use, the Bayer-owned Trademarks in interstate commerce for the purpose of selling non-genuine products bearing the Bayer-owned Trademarks without Bayer's consent.

140.    The products bearing the Bayer-owned Trademarks that Defendants sell are not authorized for sale by Bayer.

141.    Defendants' use of the Bayer-owned Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Bayer-owned Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Bayer when they are not.

142.    Defendants' use of the Bayer-owned Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Bayer Products.

---

[3] Bayer only brings its first and third causes of action as to the marks that it owns, the Bayer-owned trademarks.  These claims do not relate to the Bayer-licensed Trademarks.  The Bayer-licensed Trademarks are addressed in Bayer's second cause of action for unfair competition.

143.    The products sold by Defendants are not, in fact, genuine Bayer Products.  The products sold by Defendants are materially different from genuine Bayer Products because, among other reasons, they are ineligible for the Bayer Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Bayer's quality control requirements.

144.    Defendants' unauthorized use of the Bayer-owned Trademarks has infringed upon and materially damaged the value of the Bayer-owned Trademarks, and caused significant damage to Bayer's business relationships.

145.    As a proximate result of Defendants' actions, Bayer has suffered, and will continue to suffer, immediate and irreparable harm.  Bayer has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

146.    Bayer is entitled to recover its damages caused by Defendants' infringement of the Bayer-owned Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

147.    Bayer is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, Bayer will suffer irreparable harm.

148.    Bayer is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Bayer Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition – 15 U.S.C. § 1125(a)(1)(A)

149.    Bayer hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

150.     As set forth above, Defendants are selling non-genuine products bearing the Bayer-licensed Trademarks that are materially different from genuine Bayer Products.

151.     Defendants' sale of non-genuine products bearing the Bayer-licensed Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Bayer when they are not.

152.     Defendants' sale of non-genuine products bearing the Bayer-licensed Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Bayer Products when they are not.

153.     Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

154.     As the exclusive licensee to the Bayer-licensed Trademarks, Bayer has standing to bring a claim for unfair competition under 15 U.S.C. § 1125(a)(1)(A).  *See Hotaling & Co. v. Ly Berditchev Corp.*, Civil Action No. 20-cv-16366, 2021 U.S. Dist. LEXIS 161669, at *8-11 (D.N.J. Aug. 26, 2021).

155.     Bayer is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Bayer will suffer irreparable harm.

156.     Bayer is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

### THIRD CAUSE OF ACTION
**Common Law Trademark Infringement and Unfair Competition**

157.     Bayer hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

158.    The Bayer-owned Trademarks have been registered with the United States Patent and Trademark Office.

159.    Bayer is the owner of the Bayer-owned Trademarks.

160.    The Bayer-owned Trademarks are valid and subsisting trademarks in full force and effect.

161.    The Bayer-owned Trademarks are distinctive and widely recognized by the consuming public.  Bayer Products are purchased and sold by Bayer's Authorized Sellers throughout the United States, including in New Jersey.

162.    Bayer is widely recognized as the designated source of goods bearing the Bayer-owned Trademarks.

163.    Defendants willfully and knowingly used, and continue to use, the Bayer-owned Trademarks in interstate commerce for the purpose of selling products bearing the Bayer-owned Trademarks without Bayer's consent.

164.    The products bearing the Bayer-owned Trademarks that Defendants sell are not authorized for sale by Bayer.

165.    Defendants' use of the Bayer-owned Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Bayer-owned Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Bayer when they are not.

166.    Defendants' use of the Bayer-owned Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Bayer Products.

40

167.     The products sold by Defendants are not, in fact, genuine Bayer Products.  The products sold by Defendants are materially different from genuine Bayer Products because, among other reasons, they are ineligible for the Bayer Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Bayer's quality control requirements.

168.     Defendants' unauthorized use of the Bayer-owned Trademarks has infringed upon and materially damaged the value of the Bayer-owned Trademarks, and caused significant damage to Bayer's business relationships.

169.     As a proximate result of Defendants' actions, Bayer has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

170.     Bayer is entitled to recover its damages caused by Defendants' trademark infringement and unfair competition and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

171.     Bayer is entitled to recover punitive damages because Defendants have acted with fraud, malice, and willful and wanton conduct.

### FOURTH CAUSE OF ACTION
### Tortious Interference with Contracts

172.     Bayer hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

173.     Bayer Products are sold to the public exclusively through Bayer's network of Authorized Sellers.

174.     Bayer has entered into valid and enforceable agreements with its Authorized Sellers to sell Bayer Products.  These agreements specifically prohibit Authorized Sellers from selling Bayer Products to unauthorized resellers such as Defendants.

175.     Defendants are not Authorized Sellers of Bayer Products.  Despite this, Defendants have sold and are continuing to advertise and sell a high volume of products bearing the Bayer Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.

176.     Thus, upon information and belief, Defendants have purchased Bayer Products from Authorized Sellers for the purpose of reselling them on the Internet.

177.     By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Bayer.

178.     Defendants have known that Bayer's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

179.     Defendants have known of this prohibition, among other reasons, because Bayer informed Defendants of this prohibition in a cease-and-desist letter it mailed to Defendants on July 13, 2023.

180.     Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Bayer's agreements with its Authorized Sellers by continuing to induce Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

181.     In interfering with Bayer's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Bayer Products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Bayer—so that Defendants could unlawfully and materially damage the value of the Bayer Trademarks by reselling the products on the Internet, thereby committing an independent tort.

182.    Bayer's agreements with its Authorized Sellers are a specific class of contract that Defendants are causing Authorized Sellers to breach when they purchase products from Authorized Sellers for resale.  Although Bayer does not yet know which specific Authorized Seller(s) have breached their agreements with Bayer—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for Bayer's claim of tortious interference.

183.    Defendants are not parties to the contracts they caused Authorized Sellers to breach.

184.    Defendants' actions have caused injury to Bayer for which Bayer is entitled to compensatory damages in an amount to be proven at trial.

185.    The injury to Bayer is immediate and irreparable, as Bayer's reputation and relationships have been damaged among its consumers and Authorized Sellers.

186.    Bayer is also entitled to recover punitive damages because Defendants have acted with fraud, malice, and willful and wanton conduct.

## PRAYER FOR RELIEF

WHEREFORE, Bayer prays for relief and judgment as follows:

A.    Judgment in favor of Bayer and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest, as permitted by law;

B.    An accounting of Defendants' profits from their sales of infringing products bearing the Bayer Trademarks;

C.      A permanent injunction enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

      i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Bayer Products;

      ii)      Prohibiting the Enjoined Parties from using any of the Bayer Trademarks in any manner, including advertising on the Internet;

      iii)      Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Bayer Products as well as any products bearing any of the Bayer Trademarks;

      iv)      Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Bayer Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

      v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any Bayer Products or any of the Bayer Trademarks;

vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting Internet search engines (such as Google, Yahoo!, and Bing) to remove from the Internet any of the Bayer Trademarks which associate Bayer Products or the Bayer Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)     Requiring the Enjoined Parties to take all action to remove the Bayer Trademarks from the Internet, including from the website www.amazon.com; and

viii)     Requiring Defendants to destroy or return to Bayer all products bearing the Bayer Trademarks in their possession, custody, or control;

D.     An order requiring Amazon.com, Inc. to freeze all funds in any accounts owned or controlled by Defendants;

E.     An award of attorneys' fees, costs, and expenses; and

F.     Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Bayer demands a trial by jury on all issues so triable.

Date:  August 2, 2024

                                /s/ *Michael J. Gesualdo*
                                Michael J. Gesualdo
                                **ROBINSON MILLER LLC**
                                110 Edison Place
                                Suite 302
                                Newark, NJ 07102
                                Telephone: (973) 690-5400
                                Email: mgesualdo@rwmlegal.com

Martha Brewer Motley (OH Bar No. 0083788)
**VORYS, SATER, SEYMOUR AND PEASE LLP**
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-5626
Email: mbmotley@vorys.com
*pro hac vice application forthcoming*

Emma K. Morehart (OH Bar No. 0098085)
**VORYS, SATER, SEYMOUR AND PEASE LLP**
301 East Fourth Street, Suite 3500
Cincinnati, OH 45202
Telephone: (513) 723-4036
Email: ekmorehart@vorys.com
*pro hac vice application forthcoming*

*Attorneys for Plaintiff Bayer Healthcare LLC*

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy in the above-captioned action is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

*/s/  Michael J. Gesualdo*
Michael J. Gesualdo